# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19-00035-01-CR-W-HFS |
| | ) | |
| COREY L. SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant Corey Smith's Motion to Suppress. Doc. 24. For the reasons set forth below, the undersigned recommends Defendant's Motion to Suppress be GRANTED.

## I.       BACKGROUND

On February 14, 2020, the grand jury returned a twelve-count superseding indictment charging Defendants Corey Lavelle Smith, Dameon Devor Williams, Kenyashae Monae Roach, and Demetrius Armon Cornelius. Doc. 31. Defendant Smith, whose motion to suppress is the subject of this Report and Recommendation, was charged with one count of conspiracy to engage in sex trafficking in violation of 18 U.S.C. §§ 1591(a), 1591(b), and 1594(c) (Count One); two counts of sex trafficking in violation of 18 U.S.C. §§ 1591(a), 1591(b)(1), 1591(c), and 1594(a) (Counts Two and Three); two counts of sex trafficking in violation of 18 U.S.C. §§ 1591(a), 1591(b)(1), and 1594(a) (Counts Four and Five); two counts of transportation of a minor for prostitution in violation of 18 U.S.C. §§ 2423(a) and 2423(e) (Counts Eight and Nine); and one count of interstate transportation for prostitution in violation of 18 U.S.C. § 2421 (Count Ten). *Id.* at 1-7.

Defendant Smith moves to suppress his statements to law enforcement during a custodial interrogation on January 10, 2019. Doc. 24. On April 7, 2021, the undersigned held an evidentiary hearing on the motion to suppress. Doc. 88. Defendant was present and represented by counsel, Martin Warhurst. The Government was represented by Assistant United States Attorney Catherine Connelly. At the evidentiary hearing, one witness, Special Agent Timothy Kixmiller, testified. Additionally, three exhibits were admitted into evidence:

Government Exhibit 1 – Audio Recording of January 10, 2019 Interview

Government Exhibit 3 – Video Recording of January 10, 2019 Interview

Government Exhibit 4 – ICE Form 73-025: Statement of Rights and Waiver

## II. FINDINGS OF FACT

Based on the evidence adduced at the evidentiary hearing, the undersigned submits the following findings of fact:

1. At approximately 11:13 p.m. on January 9, 2019, Defendant Corey Smith was detained after a vehicle stop. Tr. at 6-7.[1]

2. Homeland Security Investigations ("HSI") Special Agent Timothy Kixmiller arrived shortly thereafter and arrested Defendant. Tr. at 7-8.

3. At the time of the arrest, Agent Kixmiller smelled marijuana and asked Defendant if he had marijuana on his person. Defendant stated he did not have marijuana on him. Tr. at 8.

4. Shortly thereafter, Defendant was transported to the HSI Field Office located in Kansas City, Missouri. Tr. at 9.

5. According to Agent Kixmiller, Defendant appeared "relaxed," not intoxicated, and was aware of his surroundings and the circumstances of his arrest. Tr. at 8-9.

---

[1] "Tr." refers to the Transcript of Hearing on Motion to Suppress. Doc. 90.

6.      At approximately 12:30 a.m. on January 10, 2019, Defendant was placed alone in a holding cell at the HSI Field Office, and the agent noticed Defendant "was in and out of sleep and just relaxing" "most of the time" he was in the holding cell.  Tr. at 9-10.

7.      At approximately 2:00 a.m., Agent Kixmiller stopped by Defendant's holding cell and saw him sleeping.  Tr. at 11.

8.      At another time between 12:30 a.m. and 4:45 a.m., Agent Kixmiller, via closed circuit video, observed Defendant lying on the bench in his holding cell.  Tr. at 11-12.

9.      At about 4:45 a.m., Defendant was taken to a room to be interviewed.  Tr. at 9-10, 14.

10.     According to Agent Kixmiller, the entire interview was audio recorded.  The audio recording, which was admitted as Government Exhibit 1 at the hearing, is two hours, two minutes, and twenty seconds in length.  Tr. at 3, 13-14; Ex. 1.[2]

11.     Due to what Agent Kixmiller described as technical issues, only the first thirty-seven minutes and twenty-six seconds of the interview were video recorded.  Tr. at 13-14; Ex. 3.

12.     The video recording was admitted as Government Exhibit 3 during the hearing.  Tr. at 3, 13-14, 20; Ex. 3.[3]

13.     During the interview, Defendant was seated in a chair at a table and was not physically restrained.  Tr. at 21-22; Ex. 3.

---

[2] Exhibit 1 consists of three audio files labeled IMG_0272, IMG_273, and IMG_274.  The timestamps in the audio files begin anew with each file.  To avoid confusion, the Court refers to IMG_0272 as "Audio File 1," IMG_273 as "Audio File 2," and IMG_274 as "Audio File 3" when identifying particularly portions of the interview.  Audio File 1 is forty-eight minutes and forty seconds in length, Audio File 2 is one hour and one minute in length, and Audio File 3 is twelve minutes and forty seconds in length.

[3] Both parties stipulated to the authenticity of Government Exhibit 1 and Government Exhibit 3.  Tr. 2-3.

14.    Defendant was provided a copy of ICE Form 73-025: Statement of Rights, a consent form for HSI to search his phones, and a consent form for HSI to search his residence.  Tr. at 14-16, 19-20; Ex. 1, Audio File 1, at 04:23 – 04:44; Ex. 4.

15.    Agent Kixmiller began the interview by reading the Statement of Rights, which was admitted as Government Exhibit 4 during the hearing.  Specifically, he stated the following:

> So, I am going to read this and just look as, look as we go across.  Before we ask any questions, it is my duty to advise you of your rights.  You have the right to remain silent.  Anything you say can be used against you in a court of law or other proceedings.  You have the right to consult with an attorney before making any statements or answering any questions.  Alright?  You have the right to have an attorney present with you during questioning.  If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.  If you decide to answer questions now, you still have the right to stop the questioning at any time or to stop the questioning for the purpose of consulting an attorney.  So, you understand that?

Ex. 1, Audio File 1, at 01:57 – 02:39; Ex. 3 at 00:47 – 01:30; Ex. 4; Tr. 4-5, 14-16.[4]

16.    As he read the Statement of Rights, Agent Kixmiller believed Defendant was reading and following along.  Tr. at 16.

17.    After Agent Kixmiller asked if Defendant understood, the following exchange occurred:

| | |
|---|---|
| **Defendant:** | Mmm hmm. |
| **Kixmiller:** | So basically, it says. |
| **Defendant:** | No, I was, I was looking at the last part. |
| **Kixmiller:** | Sure.  Well, we're not, we're not there yet.  But basically, it says – and you know how to read and write – that I am going to ask you some questions, you don't have to answer them.  Uh, if you want an attorney, we can stop so you can talk to an attorney or one will be appointed.  And normally, when it says one will be appointed, that, |

---

[4] Neither party provided certified transcripts of the recordings.  Instead, the parties' briefs included counsel's impressions as to what was said during the interview.  *See* Doc. 24 at 2-10, 14, 19; Doc. 28 at 3-14, 16-17, 19, 21, 23-24.  In its Findings of Fact, the Court's recitation of what was said during the interview is based on its careful and repetitive review of the actual video and audio recordings admitted as exhibits at the suppression hearing.

|  | that happens if you are officially charged, or you understand what I am saying? |
|---|---|
| **Defendant:** | Mmm hmm. |
| **Kixmiller:** | We are not going to give you an attorney just to talk to us. Uh, but if you are officially charged, then the Court will appoint an attorney for you. |

Ex. 1, Audio File 1, at 02:40 – 03:11; Ex. 3 at 01:31 – 02:02; Tr. at 16-17.

18.     Agent Kixmiller testified that although he typically reads the *Miranda* form verbatim, he deviated from the form to further explain the right to counsel because, in his experience, "people ask about…if they need an attorney or when they're going to get an attorney when it deals with appointment." Tr. at 18.

19.     Approximately 90 seconds later, the following exchange occurred:

|  | |
|---|---|
| **Kixmiller:** | So, having that in mind, and having these rights in mind, I have read or have or someone has read to me this statement of my rights and I understand what my rights are. At this time, I'm willing to answer questions without a lawyer present. You understand that? |
| **Defendant:** | Mmm hmm. |
| **Kixmiller:** | So, basically, what it says is I want to talk to you. You hopefully want to talk to me. I'm going to ask you questions. If you're uncomfortable with a question, you don't have to answer that question. Alright. But this is my time to talk to you so we can find out about that young girl in the backseat. |
| **Defendant:** | Mmm hmm. |
| **Kixmiller:** | Okay? You cool with that? |
| **Defendant:** | Man. Ah. |

Ex. 1, Audio File 1, at 04:40 – 05:15; Ex. 3 at 03:30 – 04:05.

20.     Defendant's response prompted HSI Special Agent Joseph Stewart, who was also present during the interview, to ask if Defendant was still high and Agent Kixmiller to inquire when Defendant last smoked marijuana. Ex. 1, Audio File 1, at 05:15 – 05:23; Ex. 3 at 04:06 – 04:14; Tr. at 24.

5

21.    Defendant said he was not high and last smoked marijuana at 6:00 or 7:00 p.m.  Ex. 1, Audio File 1, at 05:20 – 05:39; Ex. 3 at 04:10 – 04:29; Tr. at 24.

22.    When asked if he was on any medications or was drunk, Defendant answered in the negative and said he was "just tired."  Ex. 1, Audio File 1, at 05:40 – 05:46; Ex. 3 at 04:30 – 04:36.

23.    When Agent Stewart asked Defendant if he had "all his mental faculties" and was "clear headed," Defendant said, "Mmm hmm."  Ex. 1, Audio File 1, at 05:47 – 06:00; Ex. 3 at 04:37 – 04:50.

24.    Agent Kixmiller proceeded to tell Defendant that the forms in front of him were "three different things."  He continued with the following:

> The first thing is this is for us to talk to you, so you understand what your rights are…. This is a consent form for us to look at your phones.  And then this would be a consent form to, uh, go through your apartment, check your apartment.  All these are independent of themselves, so you would have to sign each and every one of these documents to allow us to do the phones, or to do the apartment, or to talk to you.

Ex. 1, Audio File 1, at 06:01 – 06:07, 06:13 – 06:30; Ex. 3 at 04:51 – 04:58, 05:03 – 05:21.

25.    Less than fifteen seconds later, Defendant, while looking down, said, "Yeah, I'm just thinking about my possibilities, that's all."  Ex. 1, Audio File 1, at 06:44 – 06:47; Ex. 3 at 05:35 – 05:38.

26.    The agents responded as follows:

**Stewart:**    You want a couple minutes to think about it?

**Kixmiller:**  We can give you a couple minutes to think about it.  Or, we can start it, you can sign it, and you start it.  If you don't like the, if you don't like the question, you don't have to answer it.  Or, if you want to stop when we get started, you can stop.

Ex. 1, Audio File 1, at 06:51 – 07:04; Ex. 3 at 05:42 – 05:55.

6

27.     Agent Kixmiller, referring to the forms,[5] then told Defendant, "we don't even have to worry about those right now," and the agents proceeded to talk with Defendant about where he lived in the apartment building.  Ex. 1, Audio File 1, at 07:07 – 07:40; Ex. 3 at 05:58 – 06:33.

28.     Shortly thereafter, Agent Kixmiller asked Defendant, "So, what's causing you pause, my man?"  Ex. 1, Audio File 1, at 08:15 – 08:17; Ex. 3 at 07:06 – 07:08.

29.     Defendant did not respond immediately, so Agent Kixmiller said, "We can deal with these one at a time, or I can answer your questions, or whatever you want to do."  Ex. 1, Audio File 1, at 08:19 – 08:23; Ex. 3 at 07:10 – 07:14.

30.     Defendant told the agents he "never thought [he] would be in this situation" but saw this "type of stuff on TV all the time."  Ex. 1, Audio File 1, at 08:24 – 08:34; Ex. 3 at 07:14 – 07:24.

31.     One of the agents said, "We actually read you the rights," to which Defendant responded, "Yeah."  Ex. 1, Audio File 1, at 08:34 – 08:37; Ex. 3 at 07:25 – 07:28.

32.     During the first ten minutes of the interview, the agents told Defendant he did not have to answer questions, he could refuse to answer questions, or he could stop the questioning. In addition to the statements identified in the foregoing paragraphs, the agents made the following statements:

     a.     "If you don't want to answer a question, you don't, you can refuse to answer that question.  If you have a question that we talk you're not comfortable or you don't understand, you can ask me to repeat it or come at it a different way, so you understand what I'm asking ya."  Ex. 1, Audio File 1, at 03:46 – 04:02; Ex. 3 at 02:37 – 02:53.

---

[5] It is unclear if Agent Kixmiller was referring to all three forms.

b. "So, if you want to stop the questioning, we can stop that too." Ex. 1, Audio File 1, at 04:18 – 04:22; Ex. 3 at 03:09 – 03:13.

c. "So that you know, you know that you have the ability to stop answering questions or not answer a question at all." Ex. 1, Audio File 1, at 06:36 – 06:42; Ex. 3 at 05:26 – 05:33.

d. "All we ask is that you tell us the truth. And if there's something there where you think you've got an issue, just don't answer the question." Ex. 1, Audio File 1, at 08:59 – 09:06; Ex. 3 at 07:50 – 07:57.

e. "But if you don't want to give a statement too, that's cool. But this is your chance to explain stuff to us." Ex. 1, Audio File 1, at 09:08 – 09:14; Ex. 3 at 07:59 – 08:15.

f. "This is kinda your chance, umm, to say what you want to say. If you don't want to say anything, that's cool too." Ex. 1, Audio File 1, at 10:17 – 10:23; Ex. 3 at 09:08 – 09:14.

33. Approximately ten minutes after the interview began, Agent Kixmiller informed Defendant of the difference between "state and local" and "federal," stating the following about the "federal" criminal justice system:

On the federal side, completely different. We actually give you points that we call downward departure. If it comes to a point where you're gonna get charged or if you gonna get charged, we have a scale. So, if you talk to us and you're cooperating, all those points go up, and the offense goes down. You understand what I'm saying? We're not saying you're being charged because we don't know. We don't make that decision. All we know is we got a fourteen-year-old runaway in the backseat of your car, and we want to talk to you to get your side of the story to see if what they're throwing dirt on is true, or if what they're saying is accurate, or if they're just full of bunk.

Ex. 1, Audio File 1, at 10:43 – 11:23; Ex. 3 at 09:34 – 10:13.

34.     Agent Stewart told Defendant, "the story is still unclear," the agents' "job is find facts," and they "can only figure out what the facts are by hearing the story." Ex. 1, Audio File 1, at 11:23 – 11:49; Ex. 3 at 10:13 – 10:39.

35.     About thirty seconds later, Agent Kixmiller said, "Bottom line is we don't know what Corey knows unless we talk to Corey." Ex. 1, Audio File 1, at 12:26 – 12:29; Ex. 3 at 11:17 – 11:20.

36.     Defendant responded, "Yeah, Corey ain't got nothin' goin' on. It's just, I don't know. I ain't never been in a situation like this before." Ex. 1, Audio File 1, at 12:29 – 12:38; Ex. 3 at 11:20 – 11:29.

37.     Approximately twenty seconds later, Agent Stewart said, "But you did read, you did read and understand all your rights?" Ex. 1, Audio File 1, at 13:00 – 13:03; Ex. 3 at 11:51 – 11:53.

38.     Defendant responded with "mmm hmm," while smiling and nodding his head, and then stated, "I see what ya'll saying." Ex. 1, Audio File 1, at 13:03 – 13:05; Ex. 3 at 11:54 – 11:56.

39.     A few seconds later, Defendant said, "I think I let you all know what's going on. 'Cause I just. I'm debating on (unintelligible). I've been sitting in there. I don't know what was goin' on. You all was (unintelligible). I was asleep." Ex. 1, Audio File 1, at 13:08 – 13:21; Ex. 3 at 11:58 – 12:11.

40.     Agent Stewart told Defendant they wanted to know about his relationship with the girl who was in his vehicle, when and how he met her, and what he knew about her. Ex. 1, Audio File 1, at 13:40 – 14:00; Ex. 3 at 12:31 – 12:51.

41.     Defendant proceeded to answer the agents' questions. Ex. 1, Audio File 1, at 14:01 – 32:38; Ex. 3 at 12:52 – 31:28.

42.     Approximately thirty minutes into the interview, Agents Kixmiller and Stewart made the following statements to Defendant:

a.      "I know you are feeling pressure right now.  But, um, the best thing you can do is tell the truth on all this, okay?"  Ex. 1, Audio File 1, at 32:40 – 32:53; Ex. 3 at 31:30 – 31:43.

b.      "So, like, you know what I'm sayin', man?  Like, like, it's going to be easier for you to get to the heart of this.  'Cause I'm trying to figure out if you were, if you were mistold, like they lied to you, or if you actually did it knowingly."  Ex. 1, Audio File 1, at 33:34 – 33:53; Ex. 3 at 32:25 – 32:43.

c.      "It's a lot easier to tell the truth."  Ex. 1, Audio File 1, at 33:57 – 33:59; Ex. 3 at 32:47 – 32:49.

d.      "But, like, playin' the hard road on this is really not gonna help you, dude, 'cause there's stuff you're not gonna to be able to beat on this story.  And lyin' and lyin' and lyin' and lyin' is just gonna make you look worse."  Ex. 1, Audio File 1, at 34:38 – 34:48; Ex. 3 at 33:29 – 33:38.

43.     The agents then told Defendant what they thought would be a more believable story than what he was telling them, but they would not know what actually occurred unless Defendant told them the truth.  Ex. 1, Audio File 1, at 34:58 – 35:40; Ex. 3 at 36:55 – 37:37.

44.     Agent Kixmiller stated, "We're giving you the chance to come and tell us what we already know, brother.  We're tryin' to get you to clean up what we already know."  Ex. 1, Audio File 1, at 38:04 – 38:12.

45.     A few minutes later, Agent Stewart said, "If you carry this on your shoulders and just try to stoneface through this, man, 'cause, you know you're going to be left floundering, you know you're going to be left floundering." Ex. 1, Audio File 1, at 41:36 – 41:48.

46.     After Defendant asked to take a cigarette break to calm down, the following conservation occurred between Agent Stewart and Defendant:

> **Stewart:**     I know you're scared to death, man. I know you're scared to death. I know you don't want to be that story. I know you don't. Okay? Listen to me, listen to me. If you don't, we need to know what really happened, or people are gonna assume the worst. Okay? And ain't nobody gonna believe the story that you only knew her a couple times and this and that and this and that. Because, like I said, man, we're gonna keep digging because we're not that smart but we are relentless. So, like, you know, give us consent to go to your apartment. We get in that way. You don't give us consent, we write a search warrant. We make an application for a search warrant. Maybe we get in that way, right?
>
> **Defendant:**     Mmm hmm.
>
> **Stewart:**     And then let's say we go in there, and we see a lock on the wrong side of the door. Right?
>
> **Defendant:**     Mmm hmm.
>
> **Stewart:**     That looks like you would put it there to keep someone in. That could be construed the wrong way, right?
>
> **Defendant:**     Mmm hmm.
>
> **Stewart:**     So, there's questions about stuff like that that you may wanna get out of the way first.

Ex. 1, Audio File 1, at 41:58 – 42:18, 42:38 – 42:53, 42:57 – 44:01.

47.     After Agent Stewart and Defendant briefly discussed what one of his neighbors allegedly saw during the prior week, Agent Stewart stated, "So, like, it's like stuff like, bro. Like, you gotta explain it to us. Otherwise, I am going to assume the otherwise." Ex. 1, Audio File 1, at 44:14 – 45:16.

48.     After taking a cigarette break, Agent Kixmiller said, "And, you know, it's our time to hear from Corey." Ex. 1, Audio File 2, at 00:00 – 00:05.

49.     Defendant continued to answer the agents' questions. Ex. 1, Audio File 2, at 02:46 – 05:59.

50.     After a few minutes, Defendant told the agents he did "not know the exact laws" and did not "feel comfortable" answering certain questions. Ex. 1, Audio File 2, at 06:18 – 06:44.

51.     Agent Kixmiller repeated the difference between the state and federal criminal justice systems, telling Defendant if he took responsibility for his actions and "owned up" to his conduct, he would "get credit" from the Government, a downward departure, and a lower guideline or a lower "sentencing." Ex. 1, Audio File 2, at 06:54 – 07:30. The agents clarified they did not personally make that decision. Ex. 1, Audio File 2, at 7:30 – 7:34.

52.     Roughly fifteen seconds later, Agent Kixmiller said the following:

> We're tryin' to give you an opportunity to tell us, to help us, to help you, so when we write our reports, we can say he was honest with us, he was telling us the truth, he was cooperative, he realized that he had made a mistake and he wanted to own up to it and fix it and move on. But we can't do that. We can't be your cheerleader unless you talk to us. And that's what we're tryin' to do. We are tryin' to be your cheerleader down the road.

Ex. 1, Audio File 2, at 08:09 – 08:37.

53.     Defendant continued to answer the agents' questions. Ex. 1, Audio File 2, at 10:11 – 1:01:00.

54.     When discussing potentially illegal conduct, Agent Kixmiller stated, "You're not being charged right now, man. We're just trying to find out what the truth is." Ex. 1, Audio File 2, at 14:14 – 14:53.

55.     Over thirty minutes later, Agent Stewart again told Defendant that he had not been charged, and the agents "don't make charging decisions.  The AUSA will have to decide if there are any federal charges there or not."  Ex. 1, Audio File 2, at 48:35 – 48:42.

56.     At the close of the interview, which lasted about two hours, Defendant executed the form consenting to HSI's search of his phones.  Ex. 1, Audio File 3, at 01:34 – 02:36.

57.     After Defendant signed the form, Agent Kixmiller asked Defendant if he read the form.  Defendant did not audibly respond.  Agent Kixmiller then read the form aloud.  Ex. 1, Audio File 3, at 02:51 – 04:39.

58.     Agent Kixmiller proceeded to read aloud the form allowing HSI to search Defendant's residence.   Ex. 1, Audio File 3, at 04:40 – 07:23.

59.     Defendant signed the form, consenting to a search of his residence.  Ex. 1, Audio File 3, at 07:23 – 07:53.

60.     Defendant did not sign the waiver on the Statement of Rights before he answered any of the agents' questions.  Tr. at 32; *see* Ex. 1 and Ex. 3.

61.     According to the Government, Defendant did not execute the waiver on the Statement of Rights until "later in the interview," but it was "signed in the audio" recording.  Tr. at 32-33.

62.     During the audio recording, there is no mention of Defendant signing the waiver on the Statement of Rights.  *See* Ex. 1, Audio Files 1 – 3.

63.     Apart from the first few minutes of the interview, the Statement of Rights was not mentioned again during the interview until the final four minutes of the audio recording when

13

Agent Stewart asked, "Can you grab the, like three of the *Miranda* form [unintelligible] so we can get that one too?"[6]  Ex. 1, Audio File 3, at 08:03 – 08:05.

64.     Roughly thirty seconds later, Agent Kixmiller asked where the *Miranda* form was.  Ex. 1, Audio File 3, at 08:35 – 08:37.

65.     While Agent Stewart talked with Defendant about what he wanted to eat, Agent Kixmiller made the following statement: "And then we'll get, uh, the *Miranda* form wherever that's at."[7]  Ex. 1, Audio File 3, at 08:44 – 08:48.

66.     According to Agent Kixmiller, the Statement of Rights was on the table in front of Defendant during the first twenty-five or thirty minutes of the interview after which the form was "shuffled…under [Agent Kixmiller's] notebook" because he "was taking notes" and did not want to "misplace or lose it."  Tr. at 20.

67.     At some unknown time not reflected on the video or audio recordings, the Statement of Rights form was signed by Defendant, Agent Kixmiller, and Agent Stewart.  Tr. at 14-15; Ex. 4.

68.     Agent Kixmiller described Defendant's demeanor during the interview as "calm," "responsive to questions," and "cordial."  Tr. at 22.

69.     In Agent Kixmiller's opinion, Defendant did not have difficulty comprehending what the agents were saying.  Tr. at 24-25.

---

[6] Based on its review of the audio recording, the Court believes Agent Stewart's question was directed at someone other than Defendant or Agent Kixmiller.

[7] Because Agent Stewart and Defendant were conversing with one another at the time this statement was made, Agent Kixmiller's statement appears to have been directed to someone other than Defendant or Agent Stewart.

70.     According to Agent Kixmiller, Defendant did not indicate he wanted to talk to a lawyer during the interview, did not bring up the subject of legal counsel, and did not express confusion about his rights.  Tr. at 14, 25.

71.     In his twenty-five years of law enforcement experience, Agent Kixmiller never witnessed the appointment of counsel for a suspect during the questioning phase.  Tr. at 27-30.

## III.     DISCUSSION

### A.     *Miranda* **Rights**

The United States Constitution protects individuals from self-incrimination.  U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court "adopted a set of prophylactic measures designed to safeguard th[is] constitutional guarantee…." *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011).   Before a suspect in custody is questioned, law enforcement must warn him that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Miranda*, 384 U.S. at 444.  These warnings are "an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere."  *Id*. at 468, 471.  While the warnings need not be given verbatim, law enforcement must reasonably convey the *Miranda* rights to the accused.  *Duckworth v. Eagan*, 492 U.S. 195, 202-03 (1989); *California v. Prysock*, 453 U.S. 355, 359-60 (1981); *Miranda*, 384 U.S. at 476.

Specific to the right to counsel, "an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation…"  *Miranda*, 384 U.S. at 471.  The Court described the right to counsel warning as "an absolute prerequisite to interrogation."  *Id.*  It also held "the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel **prior** to

questioning, but also to have counsel present **during** any questioning if the defendant so desires." *Id.* at 469-70 (emphasis added).

In addition, "it is necessary to warn [the individual] that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one." *Id*. at 473. The Court further observed, "[t]he warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent – the person most often subjected to interrogation – the knowledge that he too has a right to have counsel present." *Id.* Thus, "only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it." *Id*.

## B.    Waiver of *Miranda* Rights

An "accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *Miranda*, 384 U.S. at 444. Courts apply a two-part inquiry to determine whether the accused waived effectuation of his or her *Miranda* rights. *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citations omitted). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. (often referred to as a "knowing and intelligent" waiver).

When determining whether the accused's waiver was valid, courts examine the "totality of the circumstances" surrounding the interrogation. *Id*. (quoting *Fare v. Michael C.,* 442 U.S. 707,

725 (1979)). Courts have recognized a variety factors in assessing the voluntariness of waiver, including the accused's age, intelligence, and education; whether the accused consented after receiving *Miranda* rights; whether the accused suffered from mental impairments; the length of time the accused was detained and questioned; whether the accused was without counsel when questioned; whether law enforcement made promises or misrepresentations; and whether the accused, due to prior arrests, was aware of the rights and protections afforded by the legal system. *See*, *e.g.*, *United States v. Vinton*, 631 F.3d 476, 481-83 (8th Cir. 2011) (citation omitted); *United States v. Kime*, 99 F.3d 870, 880 (8th Cir. 1996); *United States v. Larry*, 126 F.3d 1077, 1079 (8th Cir. 1997).

A waiver of *Miranda* rights may be explicit or implicit. *Berghuis*, 560 U.S. at 383-85 (citations omitted); *United States v. Zamarripa*, 544 F.2d 978, 980-81 (8th Cir. 1976) (citations omitted) ("A voluntary waiver need not assume any particular form; it may be made in writing…or it may be made orally by replying to questions…."). The law presumes "an individual who, with a full understanding of his or her [*Miranda*] rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 385 (citations omitted). Regardless of whether the waiver is explicit or implicit, the Government must prove by a preponderance of the evidence that the waiver was both voluntary and knowing and intelligent. *Id*. at 382-83; *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986) (citations omitted); *United States v. Figueroa-Serrano*, 971 F.3d 806, 814 (8th Cir. 2020) (citations omitted).

**(1)    Was the Waiver Voluntary?**

A waiver of Fifth Amendment privilege is considered voluntary unless there is evidence the individual's will was overborne and his or her "capacity for self-determination" was critically impaired due to the actions of law enforcement. *Colorado v. Spring*, 479 U.S. 564, 574 (1987)

(quoting *Connelly*, 479 U.S. at 163-64); *see also Moran*, 475 U.S. at 421 (holding a statement must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception."). Defendant does not argue the agents threatened or coerced him and does not allege his capacity to make his own decisions was critically impaired due to the agents' actions. *See* Doc. 24. Accordingly, the undersigned recommends the Court find Defendant's waiver was voluntary.

Defendant alternatively suggests his fatigue may have prevented him from voluntarily waiving his rights. In his motion, he contends he "had not been to sleep" before the interrogation began at 4:45 a.m. and told the agents he was very tired. Doc. 24 at 2-3. This averment contradicts evidence adduced at the suppression hearing that Defendant slept for significant periods while in the holding cell before his interrogation. Further, after carefully reviewing the audio and video recordings, the undersigned recommends a finding that any fatigue or lack of sleep did not rise to a level that would suggest the statement was not voluntarily given. The Eighth Circuit has found when an individual's mental defect "somewhat diminish[es] capacity to resist coercion," a *Miranda* waiver will not be found involuntary on the basis of diminished capacity "if there is no evidence of police coercion." *Vinton*, 631 F.3d at 483 (citation omitted). Here, there is no evidence of police coercion; thus, Defendant's fatigue did not render his waiver involuntary.[8]

---

[8] The recordings demonstrate Defendant's fatigue did not cause his will to be overborne by the agents. *See United States v. Annis*, 446 F.3d 852, 856 (8th Cir. 2006) (finding the defendant failed to establish "his pain and meth withdrawal caused his will to be overborne," and he was able to answer questions, read and review statements, and sign a report); *see also United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990) ("Intoxication and fatigue do not automatically render a confession involuntary; rather, the test is whether these mental impairments caused the defendant's will to be overborne.") (citations omitted). Although Defendant was fatigued, he was still able to answer questions and openly converse with the agents. Regardless, his fatigue may be considered below as to whether he was fully aware of his right to counsel and understood the consequences of waiving that right.

**(2)     Was the Waiver Knowingly and Intelligently Made?**

In addition to being voluntary, a waiver of *Miranda* rights must be knowing and intelligent. *Fare*, 442 U.S. at 724-25. The *Miranda* warnings ensure a waiver is knowing and intelligent by requiring the suspect to be fully advised of the constitutional privilege against self-incrimination. *Spring,* 479 U.S. at 574. A knowing and intelligent waiver is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Castro-Higuero*, 473 F.3d 880, 885-86 (8th Cir. 2007) (citation omitted).

**(a)     The Right to Counsel as Communicated to Defendant**

At the beginning of Defendant's interview, the Statement of Rights form was read by Agent Kixmiller. Relevant to the pending motion is what Defendant was told about his right to counsel:

> You have the right to consult with an attorney before making any statements or answering any questions. Alright? You have the right to have an attorney present with you during questioning. If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish. If you decide to answer questions now, you still have the right to stop the questioning at any time or to stop the questioning for the purpose of consulting an attorney.

Ex. 1, Audio File 1, at 02:11 – 2:37; Ex. 4. Agent Kixmiller then asked Defendant if he understood, to which Defendant responded with "mmm hmm." Ex. 1, Audio File 1, at 02:37 – 02:40. Neither party suggests Agent Kixmiller's reading of the Statement of Rights was inaccurate, inadequate, or misrepresented Defendant's rights. Rather, the conversation that immediately followed where Agent Kixmiller deviates from the written statement of rights form and attempts to clarify the *Miranda* right to counsel is the focus of the pending motion:

> **Kixmiller:**     So basically, it says.
>
> **Defendant:**     No, I was, I was looking at the last part.
>
> **Kixmiller:**     Sure. Well, we're not, we're not there yet. But basically, it says – and you know how to read and write – that I am going to ask you some questions, you don't have to answer them. Uh, if you want an attorney, we can stop so you can talk to an attorney or one will be

19

> appointed. ***And normally, when it says one will be appointed, that, that happens if you are officially charged, or you understand what I am saying?***
>
> **Defendant:** Mmm hmm.
>
> **Kixmiller:** ***We are not going to give you an attorney just to talk to us. Uh, but if you are officially charged, then the Court will appoint an attorney for you.***

Ex. 1, Audio File 1, at 02:40 – 03:11 (emphasis added). A matter of seconds – twenty-one seconds, to be exact – passed between when Agent Kixmiller finished reading the Statement of Rights and when he began to tell Defendant what, according to the agent, "normally" happened. Then, approximately 90 seconds later, Agent Kixmiller stated the following:

> **Kixmiller:** So, having that in mind, and having these rights in mind, I have read or…someone has read to me this statement of my rights and I understand what my rights are. At this time, I'm willing to answer questions without a lawyer present. You understand that?
>
> **Defendant:** Mmm hmm.
>
> **Kixmiller:** So, basically, what it says is I want to talk to you. You hopefully want to talk to me. I'm going to ask you questions. If you're uncomfortable with a question, you don't have to answer that question. Alright. But this is my time to talk to you so we can find out about that young girl in the backseat.
>
> **Defendant:** Mmm hmm.
>
> **Kixmiller:** Okay? You cool with that?
>
> **Defendant:** Man. Ah.

Ex. 1, Audio File 1, at 04:40 – 05:15; Ex. 3 at 03:30 – 04:05.

Almost immediately after Defendant was accurately informed of his right to counsel, Agent Kixmiller told Defendant what "normally" happened with regard to the appointment of counsel. That is, Defendant was advised an attorney would <u>not</u> be appointed for him unless he was "officially charged." To further clarify, Agent Kixmiller notified Defendant, "We are not going to give you an attorney just to talk to us." This statement was followed by a reminder that he would not be appointed counsel unless he was "officially charged." Less than two minutes after

telling Defendant, in three separate statements, that he would not be given or appointed counsel for the interview, Agent Kixmiller explained to Defendant that, by signing the waiver on the Statement of Rights, he agreed to "answer questions without a lawyer present." *Id*. Defendant's interview continued and lasted approximately two hours. Except for the above-mentioned statements, the right to counsel was never discussed again at any point during the interview.

As set forth *supra,* section III(A), Agent Kixmiller's statements (i.e., Defendant would not be given or appointed counsel just to speak with the agents and would not be appointed counsel until a future time) do not accurately depict Defendant's right to counsel under *Miranda*. 384 U.S. at 444, 479. The question before the Court is whether these inaccurate statements, which closely followed the accurate reading of the form explaining the right to counsel under *Miranda*, vitiate the accurate warning and render Defendant's waiver invalid and not knowingly and intelligently made. To determine this issue, the Court must examine the totality of the circumstances surrounding the interrogation.

### (b) Discussion After the Statement of Rights Was Read

Before the interview began, Defendant was given three forms: the Statement of Rights, a form consenting to a search of his phones, and a form consenting to a search of his residence. After reading the Statement of Rights form, Agent Kixmiller asked Defendant if he understood. Defendant did not respond with "yes." Instead, as best the Court can discern, he said, "mmm hmm." Immediately thereafter, Agent Kixmiller began to tell Defendant what the form "basically…says." Defendant, however, interrupted Agent Kixmiller, saying he was "looking at the last part." It is unclear from the recordings as to which of the three forms Defendant was referring.[9]

---

[9] If Defendant was looking at the bottom portion of the Statement of Rights, he was viewing the waiver. *See* Ex. 4. While Agent Kixmiller believed Defendant was following along as he read the Statement of

Regardless of which form Defendant was viewing, Agent Kixmiller's next statements to Defendant were clear. That is, the agent told Defendant he would not be appointed an attorney unless he was officially charged. When asked if he understood, Defendant replied with "mmm hmm." Agent Kixmiller then continued by telling Defendant he would not be given "an attorney just to talk to" the agents. And again, the agent told Defendant he would only be appointed an attorney if he was officially charged. Roughly 90 seconds later and without further discussion about the right to counsel, Agent Kixmiller asked Defendant if he understood his rights and was "willing to answer questions without a lawyer present." Defendant responded with "mmm hmm."

After this response, discussions ensued about the three forms. At one point, Agent Kixmiller said each form was separate, and Defendant would "have to sign each and every" document for the agents to "do the phones, or do the apartment, or to talk to you." Less than fifteen seconds later, Defendant told the agents he was thinking about his "possibilities." Although one agent offered to give Defendant a couple minutes to think about it, the agents continued talking, not allowing him to respond to the inquiry about whether he wanted a couple minutes.

Agent Kixmiller then told Defendant they did not have to worry about the forms right then. But it is unclear from the recordings if he was referring to all three forms or the two consent-to-search forms. Defendant was then asked what was "giving [him] pause." He did not respond immediately. Defendant eventually said he had never been in a situation like he was, he never thought he would be in this situation, and he saw this type of situation on television all the time.

---

Rights, Defendant's statement suggests he was not following along or was looking at another form. When Defendant said he was "looking at the last part," Agent Kixmiller responded, "Well, we're not, we're not there yet." Given that Agent Kixmiller had finished reading the top portion of the Statement of Rights and, ostensibly, would have read the waiver next, it is peculiar that he told Defendant they were not yet to the waiver portion if Defendant was looking at the waiver.

### (c)    The Inquiry into Whether Defendant Understood His Rights

Nearly ten minutes after the Statement of Rights was read and Agent Kixmiller deviated from the form by further discussing the right to counsel, Agent Stewart asked Defendant if he read and understood his rights.  Notably, the last statements made to Defendant about his right to counsel were (1) "[W]hen it says [a lawyer] will be appointed, that, that happens if you are officially charged"; (2) "We are not going to give you an attorney just to talk to us;" and (3) "Uh, but if you are officially charged, then the Court will appoint an attorney for you."  During the ten minutes that elapsed between these statements and the agents asking if he read and understood his rights, Defendant was told, among other things, it was the agents' time to talk with him, he had to execute a form for the agents to talk with him, he would get a lesser offense if he talked with the agents and cooperated, and it was not known whether he would be charged.

In response to Agent Stewart asking if he read and understood his rights, Defendant said "mmm hmm," while nodding his head and smiling.  Although the waiver remained in front of Defendant for approximately twenty-five minutes, the agents did not ask him to execute the waiver at that time.  Defendant's execution of the waiver is not contained on the recordings, and it is unknown if he asked any questions about the Statement of Rights or the waiver immediately before he signed the waiver.  It does not appear from this record that Defendant signed the waiver until after the custodial interrogation.

### (d)    The Agents' Other Statements

Although the right to counsel was not discussed during the remainder of the interview, the agents made several statements related to what Defendant was told about his right to counsel. These statements provide insight into whether Defendant's waiver was knowing and intelligent. For example, Defendant was told at least four times that he was not being charged:

- "We're not saying you're being charged because we don't know. We don't make that decision."

- "You're not being charged right now, man. We're just trying to figure out what the truth is."

- "[W]e don't make charging decisions. The AUSA will have to decide if there are any federal charges there or not."

- "If it comes to a point where you're gonna get charged or you gonna get charged…."

All four statements were made after Agent Kixmiller told Defendant twice that he would <u>not</u> be appointed an attorney unless or if he was "officially charged."

In addition, the agents repeatedly told Defendant that the interview was their time to talk with him. These statements included, but were not limited to, the following:

- "[T]his is my time to talk to you…."

- "[I]t's our time to hear from Corey."

- "[W]e need to know what really happened, or people are gonna assume the worst."

- "You gotta explain it to us. Otherwise, I am going to assume the otherwise."

- "We're giving you the chance to come and tell us what we already know, brother."

- "Bottom line is we don't know what Corey knows unless we talk to Corey."

- "We're tryin' to get you to clean up what we already know."

- "[T]his is your chance to explain stuff to us."

- "This is kinda your chance, umm, to say what you want to say."

Similar to the agents' comments about Defendant not being charged, these statements about the interview being their time to talk with him were made after Agent Kixmiller told Defendant, "[w]e are not going to give you an attorney just to talk to us."[10]

---

[10] In addition to the agents' comments about the interrogation being their time to talk with Defendant, they told Defendant that talking with them would positively impact any charges or sentence. For example, Agent

Curiously, after the Statement of Rights was read, the agents told Defendant at least seven separate times that he did not have to answer their questions. Defendant seemed to understand that he did not have to answer their questions. Once, he told the agents he did not "feel comfortable" answering certain questions because he did "not know the exact laws." Tellingly, Defendant did not say anything about an attorney at that time.

### (e) Defendant's Lack of Experience with Law Enforcement

The Government did not offer evidence that Defendant had experience with federal, state, or local law enforcement officers before January 10, 2019. In fact, during the interview, Defendant told the agents he had never been in a situation like the one in which he found himself. And there is no evidence that Defendant has been the subject of a previous custodial interrogation.

### (f) Defendant's Fatigue

Defendant was arrested before midnight, and the interrogation began at 4:45 a.m. Agent Kixmiller observed Defendant was sleeping and lying down in his cell between 12:30 a.m. and 4:45 a.m. During the interview, Defendant told the agents he was tired, and in passing, mentioned he had been sleeping in the cell. Agent Kixmiller observed Defendant did not have difficulty comprehending what the agents were saying and was responsive to questions. Any sleepiness or fatigue did not affect Defendant's ability to knowingly and intelligently waive his rights.

---

Kixmiller advised Defendant that if he talked to them and cooperated, he would get points called "downward departure," and the offense would be reduced. Defendant was also informed he would "get credit" from the Government and could get a lower sentence if he took responsibility for his actions. He was instructed that the interview was his "opportunity" to tell the agents what he knew so they could help him and be his "cheerleader" by reporting he was honest, cooperative, and wanted to fix his mistakes. All these statements were made after the agents advised Defendant he would <u>not</u> be given an attorney to talk with them.

### (3) Applicable United States Supreme Court Decisions

By relinquishing the protection against self-incrimination and answering the agents' questions, Defendant waived his *Miranda* rights. For his waiver to be valid, Defendant must have been fully aware of the nature of the right he abandoned and the consequences if the right was abandoned. *See Moran*, 475 U.S. at 421. In their briefing, the parties focused on two United States Supreme Court cases – *California v. Prysock* and *Duckworth v. Eagan*. While each matter provides some guidance, both are distinguishable.

### (a) *California v. Prysock*

In *California v. Prysock*, the United States Supreme Court found law enforcement's representations about a suspect's right to counsel were accurate. 453 U.S. at 361-62. Prysock, a juvenile at the time, was informed he had the right to counsel before he was questioned, he had a right to have counsel present during all questioning, and he had the right to have counsel appointed at no cost. *Id*. at 356-57. Prysock's parent then asked law enforcement if Prysock would still have an attorney later if he gave a statement without counsel at the time of the interrogation. *Id*. at 357. Law enforcement informed the parent that Prysock "would have an attorney when he went to court and that 'he could have one at this time if he wished one.'" *Id*. Prysock's motion to suppress was unsuccessful in the trial court. But the state appellate court determined he had not been adequately advised of his right to counsel before further questioning, and the California Supreme Court denied a petition for hearing. *Id*. at 358-59.

The Supreme Court found the warnings adequate. *Id*. at 361-62. The Court observed *Miranda* did not require a precise formulation or verbatim recital of the warnings to be given. *See id*. 359-60. According to the Court, when law enforcement links the right to counsel "to a future point in time after police interrogation," the individual is "not fully advise[d]… of his right to

26

appointed counsel before such interrogation." *Id*. at 360. The warnings conveyed to Prysock included "his right to have a lawyer appointed if he could not afford one prior to and during interrogation." *Id*. at 361. Further, "nothing in the warnings given [to Prysock] suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general." *Id*. at 360-61.

The matter before this Court is unlike *Prysock*. Agent Kixmiller, when explaining the *Miranda* rights to Defendant, tied the right to counsel to a future point in time – to wit, <u>when</u> Defendant was formally charged. And the agent also clearly and unambiguously informed Defendant that he would <u>not</u> be given counsel "just to talk" with the agents. Thus, Agent Kixmiller's statements incorrectly advised Defendant of his right to have counsel present during the interrogation and improperly tied the appointment of counsel to a future event after the interrogation.

This matter is more similar to the two cases discussed by the Supreme Court when differentiating the facts presented in *Prysock*. In both cases cited in *Prysock*, the suspects were misinformed of the right to counsel in that "the reference to appointed counsel was linked to a future point in time after police interrogation." *Id*. at 360 (discussing *United States v. Garcia*, 431 F.2d 134 (9th Cir. 1970), and *People v. Bolinski*, 260 Cal. App. 2d 705 (1968)).

In *Garcia*, "agents gave the suspect several different versions of the Miranda bundle of warnings," and "[o]n no occasion was a warning given fully complying with Miranda." 431 F.2d at 134. Garcia was once told she had a right to counsel "when she answered any questions" and was later informed that an attorney would be appointed to represent her when she first appeared before the United States Commissioner or the Court. *Id*. Declaring "[t]he offer of counsel must be clarion and firm," the Ninth Circuit found the "[t]he warnings failed to adequately inform Garcia

27

of her right to counsel before she said a word." *Id*. (citations omitted). And according to *Prysock*, *Garcia* was an example where a suspect was not fully advised of their right to appointed counsel. *Prysock,* 453 U.S. at 360.

In *Bolinski*, two sets of *Miranda* warnings were given to the defendant, but both were found inadequate. 260 Cal. App. 2d at 718-24. In the first set, the defendant was advised he would be appointed counsel "if he was charged." *Id.* at 718. In the second set, the defendant, who was being moved from Illinois to California, was informed that an attorney would be appointed for him in California. *Id*. at 723. Because both sets of warnings improperly advised the defendant that appointment of counsel was associated with a future point in time after police interrogation, the California Court of Appeal for the Fourth District found Bolinski "could not have been deemed to have knowingly and intelligently waived his rights." *Id.* at 721, 723. An advisement that counsel would be appointed by the court is not the equivalent of an advisement that counsel would be provided to be present during the interrogation. *Id.* at 723. And again, *Prysock* cited this case as another example where a suspect was not fully advised of their right to appointed counsel. *Pryscock,* 453 U.S. at 360.

The Government argues the matter before this Court is unlike *Garcia* and *Bolinski*. Doc. 28 at 18. Contrary to the Government's argument, Defendant, similar to *Garcia* and *Bolinski*, was given different sets of *Miranda* warnings. But the similarities do not end there. Defendant, like *Garcia* and *Bolinski*, was advised that his right to appointed counsel was linked to a future point in time <u>after</u> the interrogation. What differentiates this matter from *Garcia* and *Bolinski* is only seconds after being accurately informed he had a right to counsel during the interrogation and an attorney would be appointed to represent him, Defendant was then told he would not be given an attorney "just to talk" with the agents, and he did not have the right to counsel until he was charged

in court.  This was also followed by repeated references during the beginning of the interview by the agents that they were unsure whether charges would even be filed against Defendant.  Since Defendant was not properly advised of his right to appointed counsel for purposes of the interrogation, he could not have been deemed to have knowingly and intelligently waived his rights under *Miranda.*

        **(b)**     ***Duckworth v. Eagan***

In *Duckworth v. Eagan*, law enforcement read a document informing the defendant that he had the "right to talk with a lawyer for advice before we ask you any questions, and to have him with you during questioning" and the "right to the advice and presence of a lawyer even if you cannot afford to hire one."  492 U.S. at 197-98.  The defendant was then told, "We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court."  *Id*. at 198.  The defendant signed the waiver and provided an exculpatory explanation for his activities of the previous evening.  *Id.*

Before the second interview, another document was read to the defendant.  *Id.* at 198-99.  He was advised he had the "right to consult with an attorney…before saying anything," "an attorney may be present" while he made a statement to or conversed with law enforcement, he could "stop and request an attorney at any time during the course of the taking of any statement or during the course of any such conversation," and if he did not hire an attorney, one would "be provided" for him.  *Id*.  The defendant signed the second waiver form and confessed to a murder.  *Id*. at 199.

The Supreme Court found the additional phrase of "if and when you go to court" given during the first interview "accurately described the procedure for the appointment of counsel in Indiana."  *Id*. at 203-04 (noting counsel is appointed at the defendant's initial appearance in

Indiana). Unlike *Duckworth,* the agent in this case not only told Defendant that an attorney would be appointed only when he was officially charged, but the agent further stated, "[w]e are not going to give you an attorney just to talk to us . . ." Since *Duckworth* did not involve any type of statement that the police "are not going to give you an attorney just to talk to us," it is clearly distinguishable from the instant case. Further, unlike *Duckworth,* the instant case does not involve two different interviews where the advice of rights in the second interview appears valid.

### (4) Eighth Circuit Cases

#### (a) *Klingler v. United States*

The Government contends Agent Kixmiller's statements that an attorney would not be appointed until charges were filed and Defendant would not be given counsel to talk with the agents did not "vitiate the sufficiency of an otherwise adequate warning." Doc. 28 at 21. In support, the Government cites one Eighth Circuit case. *Id.* (citing *Klingler v. United States*, 409 F.2d 299, 307-08 (8th Cir. 1969)). In *Klingler*, the suspect was told, among other things, he had "the right to consult an attorney before making any statement or answering any question, and you may have him present with you during questioning." *Id.* Klingler was also informed he "may have an attorney appointed by the United States Commissioner or the court to represent you if you cannot afford or otherwise obtain one." *Id.* at 308. He stated he understood his rights. *Id.* The agent told Klingler he had "the right to have an attorney present with you at this time" and also had "the right to have an attorney appointed by the Court for you if you are later charged with a Federal offense." *Id.* He again indicated he understood his rights. *Id.*

In reaching its determination that Klingler voluntarily, knowingly, and intelligently waived his *Miranda* rights, the Eighth Circuit relied on a Fifth Circuit decision. *Id.* (citing *Mayzak v. United States*, 402 F.2d 152 (5th Cir. 1968)). In *Mayzak*, the Fifth Circuit found an FBI agent

informed the suspect that the FBI could not furnish a lawyer until federal charges were filed, and the statement did "not vitiate the sufficiency of an otherwise adequate warning." 402 F.2d at 154-55. Notably, neither *Klingler* nor *Mayzak* involved a statement that the agents were <u>not</u> going to give the suspect a lawyer "just to talk to them." This added statement makes the case before this Court distinguishable from *Klingler* and *Mayzak*. Further, both *Klingler* and *Mayzak* were decided several years before the *Prysock* (1981) and *Duckworth* (1989) decisions.

The Eighth Circuit has cited *Klingler* on numerous occasions. But only once has it relied on it when examining *Miranda* warnings given to a defendant. *See Tasby v. United States*, 451 F.2d 394, 398-99 (8th Cir. 1971). In *Tasby*, the Eighth Circuit noted the *Miranda* warnings given to a defendant after his second arrest included a statement that "an attorney would be appointed 'at the proper time.'" *Id*. at 398. The Court, citing *Klingler*, found the statement was a "slight deviation from the *Miranda* prescription" but did "not negate the overall effectiveness of the warning." *Id*. at 398-99. Like *Klingler*, *Tasby* was decided several years before *Prysock* and *Duckworth*. Since those cases were decided, the Eighth Circuit has not utilized *Klingler* for the proposition suggested by the Government.

### (b) *United States v. Caldwell*

The Eighth Circuit's decision in *United States v. Caldwell*, 954 F.2d 496 (8th Cir. 1992), offers some guidance. When advised of his *Miranda* rights, Caldwell was informed he had a "right for an attorney. If you can't afford one, one will be appointed to you." *Id*. at 498. When asked if he understood his rights, Caldwell shook his head, indicating he understood. *Id*. When asked again if he understood his rights, Caldwell said he did. *Id*. The issue before the Eighth Circuit was "whether a suspect must be explicitly warned that he has the right to have counsel present <u>during</u> interrogation." *Id*. at 501 (emphasis added).

31

The Eighth Circuit determined Caldwell was generally advised he had the right to counsel, and "[i]f there was a deficiency in the warning, it is in the ambiguity of the warning, not that the warning actively misled Caldwell by suggesting a false limitation of his right to counsel." *Id*. at 501-02. The Court concluded the warning "could, and arguably should, have been more explicit in advising Caldwell of his right to an attorney." *Id*. at 503. But the warning did "not rise to the level of plain error" because law enforcement advised Caldwell of his right to counsel, informed him that an attorney would be appointed if he could not afford one, and law enforcement "did not link Caldwell's right to an attorney to a future point in time after police questioning." *Id*. at 503-04. Thus, the Eighth Circuit found the warning did "not suffer from the inadequacy discussed in both *Duckworth* and *Prysock*, namely, linking the right to appointed counsel to a future point in time after interrogation." *Id*. at 502. Unlike *Caldwell*, the warnings given to Defendant in this case were misleading and inaccurate because the agents linked his right to counsel with a future point in time after the interrogation, and the agents specifically and improperly advised Defendant that he would not be given counsel "just to talk" with them.

**(5)    Other Cases**

Because the issue raised in Defendant's motion to suppress requires a fact-intensive inquiry, there are not many cases beyond those cited above that are factually similar. Somewhat similar to this matter is *United States v. Connell*, 869 F.2d 1349 (9th Cir. 1989). Therein, the Ninth Circuit observed Connell was informed he "had the right to talk to an attorney before, during, and after questioning," but "this statement was immediately followed by a strong assertion that such an attorney could not be obtained at the Government's expense." *Id*. at 1353. Connell was told "a lawyer *may* be appointed" to represent him, and he was informed in writing that "arrangements will be made for [him] to obtain a lawyer in *accordance with the law*." *Id*. (emphasis in original).

The Ninth Circuit concluded the "warnings at issue fell below the minimum required standards" because they were "equivocal and open to misinterpretation." *Id*. Because the conflicting statements created confusion and did not clearly inform the defendant of his right to counsel, the Ninth Circuit concluded the defendant's confession should have been suppressed. *Id*.

In addition, other district courts have determined a *Miranda* waiver is unknowing and/or unintelligent when the defendant is inaccurately advised that the right to counsel does not attach until sometime after the interrogation and/or misled to believe counsel will not be provided until sometime in the future. *See*, *e.g.*, *United States v. Avila*, No. EP-19-CR-3342-PRM, 2020 WL 572874, at *6-7 (W.D. Tex. Feb. 5, 2020); *United States v. Padilla*, No. 19-CR-208 (MDJ/ECW), 2019 WL 7598829, at *5-11 (D. Minn. Nov. 19, 2019), *report and recommendation adopted by* 2020 WL 264320 (D. Minn. Jan. 17, 2020); *United States v. Xi*, No. 16-22-5, 2018 WL 3340884, at *9-14 (E.D. Pa. July 6, 2018); *United States v. Lewis*, No. 11-20745-CR, 2012 WL 6569373, at *2-3, 5-10 (S.D. Fla. Dec. 17, 2012).

### (6)    Examination of Totality of Circumstances in Light of Applicable Cases

To determine whether Defendant's waiver was knowing and intelligent, the Court must consider the totality of the circumstances. *Moran v. Burbine*, 475 U.S. at 421. In addition to the foregoing discussion, the Court provides the following analysis of the totality of the circumstances.

Defendant was given a copy of the Statement of Rights, which accurately explained his *Miranda* rights. Then, Agent Kixmiller correctly read aloud the contents of the Statement of Rights. But it is unclear if Defendant actually read the Statement of Rights. Moreover, Defendant did not execute the waiver on the Statements of Rights before or during the video portion of the interview. It appears from the record that the form was not signed until the interview was over and after the audio recording stopped. Because the execution of the waiver form was not captured

on the audio recording, it is unknown if Defendant asked any questions or sought further explanation about the right to counsel.

Except for the Statement of Rights and Agent Kixmiller's reading of same, the only information about the right to counsel was supplied by Agent Kixmiller. Specifically, Defendant was advised the Statement of Rights "basically" meant the agents were going to ask him questions, and "normally, when it says [an attorney] will be appointed, that, that happens if you are officially charged…." Agent Kixmiller then unequivocally stated, "We are not going to give you an attorney just to talk to us." This statement was followed by the agent reiterating Defendant would not be appointed an attorney unless he was charged. As explained *supra*, section III(A), these statements inaccurately explained Defendant's *Miranda* rights.

At no other time during the remainder of the interrogation was the right to counsel discussed. Thus, Agent Kixmiller's misstatements were never corrected. Because he was provided conflicting information about his right to counsel, Defendant was not "clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation…." *Miranda*, 384 U.S. at 471 (holding "this warning is an absolute prerequisite to interrogation."). Additionally, the agent did not effectively and expressly explain that counsel "will be appointed to represent him." *Id*. Thus, the agent did not "convey to the indigent – the person most often subjected to interrogation – the knowledge that he too has a right to have counsel present." *Id*. at 473. Based on Agent Kixmiller's misleading, inaccurate, and conflicting statements to Defendant, the Court finds Defendant's right to counsel was not reasonably conveyed to him. *See Prysock*, 453 U.S. at 359-60; *Duckworth*, 492 U.S. at 202-03.

While Defendant seemed to indicate at one point during the interview that he understood his rights, his "understanding" does not absolve the agent's misstatements about his *Miranda*

rights. Approximately ten minutes after Agent Kixmiller misstated Defendant's right to counsel, the agents asked Defendant if he understood his rights. Defendant seemed to affirmatively respond, saying "mmm hmm" and nodding his head. However, much was said during the ten minutes that elapsed after Defendant was inaccurately informed of his rights. For example, the agents told Defendant it was their time to talk with him, he was not being charged, he had to execute the waiver to talk with them, they wanted to be his cheerleaders and help him out, he would get a lesser offense if he talked with the agents and cooperated, and he may receive a less severe sentence if he talked with them.

Based on the agent's misstatements about his rights and the discussion that ensued before he was asked if he read and understood his rights, Defendant was left with two choices. One, having been advised he would <u>not</u> be given an attorney to talk with the agents, Defendant could talk with the agents without a lawyer present and by answering questions and cooperating, he could receive more "points" for "downward departure," a lesser charged offense, and a lower sentence. Or, two, Defendant could choose not to speak with the agents, wait and see if he was formally charged and potentially face a more serious charge or higher sentence because he did not answer the agents' questions, and if or when he was charged, he would be appointed an attorney. Neither choice involved the right to counsel during the interrogation to which Defendant was entitled. While Defendant seemed to indicate he understood his rights, his "understanding" was based on the inaccurate and misleading information given to him by Agent Kixmiller.

Given Defendant's apparent lack of experience with federal (or any) law enforcement, he was not familiar with the rights afforded him. *See Vinton*, 631 F.3d at 482 ("A history of interaction with the criminal justice system supports an inference that an interviewee is familiar with his constitutional rights and that his statements to the police are voluntary."). Accordingly,

Defendant had to rely exclusively on the contents of the Statement of Rights and what the agents told him as to what his rights were.

While his fatigue is noticeable on the videorecording, Defendant was still able to coherently converse with the agents and answer questions. Thus, his fatigue, by itself, did not render his waiver unknowing and unintelligent. *See United States v. Turner*, 157 F.3d 552, 555-56 (8th Cir. 1998) (finding the defendant's below-average intelligence, intoxication, and mental illness did not render his waiver unknowing and unintelligent because his conduct and behavior demonstrated he understood his rights, agreed to answer questions, and gave accurate information).

The evidence demonstrates that while Defendant was given accurate *Miranda* warnings at the beginning of the interrogation when the form was read verbatim, the significance of those warnings was vitiated and invalidated by Agent Kixmiller's inaccurate statements and "explanation" only seconds later. Defendant was told twice that his right to counsel was linked to a future time after interrogation, and he was informed he would <u>not</u> be given an attorney to talk with the agents. Defendant was provided misleading, inaccurate, and confusing information about his right to counsel during the interrogation and his right to appointed counsel. *See Duckworth*, 492 U.S. at 203-04; *Moran*, 475 U.S. at 421; *Prysock*, 453 U.S. at 360.

These are the types of statements the Eighth Circuit indicated were misleading and inaccurate in *Caldwell*. While the Eighth Circuit found the *Miranda* rights warning given to Caldwell could have been more explicit, the Court found the warning did "not rise to the level of plain error" because he was advised of his right to counsel, was told an attorney would be appointed if he could not afford one, and significant to this matter, and law enforcement "did not link Caldwell's right to an attorney to a future point in time after police questioning." 954 F.2d at 503-04. The record before this Court is distinguishable from *Caldwell*. Here, Defendant's right to

counsel, as explained by law enforcement, was not only linked to a future point in time, but law enforcement informed Defendant would <u>not</u> be given counsel to talk with law enforcement.

Based on the foregoing, the undersigned recommends the Court find the Government has not proven by a preponderance of the evidence that Defendant's waiver was knowing and intelligent, and therefore, his waiver was not valid. The undersigned recommends that Defendant's Motion to Suppress be GRANTED.

## C.     The Parties' Arguments Regarding the Criminal Justice Act

One additional argument the Court must address is the parties' disagreement as to whether Defendant had a right to have counsel appointed under the Criminal Justice Act ("CJA"). Defendant, citing *Miranda* and the CJA, contends he had a Fifth Amendment right to counsel before and during the interrogation and also a right to have counsel appointed under the CJA. Doc. 24 at 1, 11-21. The Government argues "the appointment of an attorney under [the CJA] presupposes that any person seeking an attorney will have to appear before a court on some criminal matter…before an appointment can be made," and thus, Agent Kixmiller's statement that Defendant would not be appointed an attorney until he was charged "was accurate, and adequate under the law." Doc. 28 at 19-20.

Pursuant to the CJA, "A person for whom counsel is appointed shall be represented at every stage of the proceedings from his initial appearance before the United States magistrate judge or the court through appeal, including ancillary matters appropriate to the proceedings." 18 U.S.C. § 3006A(c); *see also* Fed. R. Crim. P. 44(a). The CJA, which "was enacted to provide compensation for attorneys appointed to represent criminal defendants in federal criminal trials," "is a means of implementing what the courts have declared to be a constitutional demand (right of counsel) under the **Sixth Amendment** and its inclusion in the due process clause of the Fourteenth Amendment."

*Ferri v. Ackerman*, 444 U.S. 193, 199 (1979) (emphasis added); *Ray v. United States*, 367 F.2d 258, 264-65 (8th Cir. 1966). As articulated by the Eighth Circuit, the CJA "may well embody the congressional judgment as to what representation to afford defendants" but "it is not a statement of what the Constitution requires." *Steele v. United States*, 518 F.3d 986, 988 (8th Cir. 2008).

The Sixth Amendment right to counsel attaches only at the initiation of adversary criminal proceedings. *Davis v. United States,* 512 U.S. 452, 456-57 (1994). However, as explained *supra*, section III(A), the Supreme Court in *Miranda* declared "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege…." 384 U.S. at 469. Since then, the Supreme Court has reiterated a separate right to counsel as provided for in *Miranda*. *See, e.g.*, *J.D.B.*, 564 U.S. at 269-70; *Berghuis*, 560 U.S. at 380-81; *Florida v. Powell*, 559 U.S. 50, 59-60 (2010); *Missouri v. Seibert*, 542 U.S. 600, 607-11 (2004); *Davis*, 512 U.S. at 456-58; *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). Pursuant to *Miranda*, Defendant had a right to counsel before and during the custodial interrogation.

Irrespective of the CJA, Defendant, who was subject to custodial interrogation, must have been advised before questioning began that he had the right to consult with an attorney and to have counsel present during questioning under *Miranda*. *Davis*, 512 U.S. at 457 (citing *Miranda*, 384 U.S. at 469-73). And he must have been warned that if he could not afford a lawyer, one would be appointed to represent him. *Miranda*, 384 U.S. at 473, 479. Whether a court had statutory authority to appoint counsel under the CJA is irrelevant to the *Miranda* analysis or the undersigned's recommendation to grant Defendant's Motion to Suppress.

## IV.    CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order granting Defendant's Motion to Suppress and suppress Defendant's statements to law enforcement on January 10, 2019.  Doc. 24.

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation.  A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation except on the grounds of plain error or manifest injustice.

DATE: August 4, 2021                                  */s/ W. Brian Gaddy*
                                                    W. BRIAN GADDY
                                                    UNITED STATES MAGISTRATE JUDGE